IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KIM ALVARADO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14 CV 4717 |
| | ) | |
| AETNA LIFE INSURANCE COMPANY, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kim Alvarado contends that Defendant Aetna Life Insurance Company wrongfully terminated the long-term disability benefits owed to her under her employer-sponsored benefit plan. She filed this action challenging that decision pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. § 1132(a)(1)(B). The parties have filed cross-motions for summary judgment. For the reasons stated below, the court grants Plaintiff's motion [52] and denies Defendant's motion [48].

## FACTUAL BACKGROUND

Plaintiff worked as a senior client services associate at UBS Financial Services from November 19, 2004 until October 8, 2012. (DSF ¶ 8; PSF ¶ 10.) During that time, she participated in the company's employer-sponsored long-term disability plan, which was issued, underwritten, and administered by Defendant for the benefit of eligible UBS employees. (Def.'s Stat. of Undisputed Mat. Facts [50] (hereinafter "DSF") ¶ 3; Pl.'s Stat. of Mat. Facts [54] (hereinafter "PSF") ¶ 1.) The Plan's "Test of Disability" defines disability as follows:

> You are disabled if, because of **injury** or **illness**, you are unable to perform all the material duties of your **own occupation**, or solely due to **injury** or **illness**, are unable to earn more than 80% of your **pre-disability earnings**. After disability benefits have been payable for 24 months, you are considered disabled if, solely due to **injury** or **illness**, you are: (1.) unable to perform the **material duties** of any **reasonable occupation** for which you are, or may reasonably become, qualified based on education, training or experience solely due to **injury** or **illness**; and (2.) unable to earn 80% or more of your **pre-disability earnings**.

1

(DSF ¶ 6; PSF ¶ 7 (emphasis in original).) The Plan grants Defendant the discretionary authority "to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under this Policy." (DSF ¶ 7; PSF ¶ 9.)

Plaintiff's primary job responsibilities at UBS included answering phones, completing forms, and typing. (PSF ¶ 11.) In addition, her job required her to engage in the following physical activities: "frequent" reaching, "occasional" lifting of up to ten pounds, repetitive hand use for simple grasping, sitting for seven hours per day, and walking for one hour per day. (DSF ¶ 19; PSF ¶ 11.) In 2012, Plaintiff developed pain and numbness in both of her hands, and by September of that year, her symptoms had progressed to the point that she found it difficult to use her arms for daily activities. (PSF ¶ 12.)

## I. Plaintiff's Carpal Tunnel Diagnosis and Surgeries

Although electrodiagnostic tests did not suggest that Plaintiff had any muscle or nerve problems, three physicians who examined her suspected that she had carpal tunnel syndrome. On October 5, 2012, her orthopedic physician, Dr. Robert Markus, diagnosed her with "suspected carpal tunnel syndrome" that had been resistant to conservative treatment attempts. (DSF ¶ 9; PSF ¶ 13.) But a nerve conduction study (NCV) and an electromyogram (EMG)— electrodiagnostic tests used to assess muscle and nerve damage—administered that day returned normal results. (DSF ¶ 10; PSF ¶ 14.) At a follow-up appointment five days later, Dr. Markus noted that he was "unable to account for patient's symptoms which are suggestive of carpal tunnel syndrome, but electrodiagnostic studies are normal," and he recommended that she see an orthopedic hand specialist. (PSF ¶ 15.) On November 1, 2012, Dr. Neal Labana, a hand surgeon, evaluated Plaintiff and determined that she was suffering from De Quervain's tenosynovitis[1] and carpal tunnel syndrome, and he administered a corticosteroid injection to

---

[1] De Quervain's tenosynovitis is an often-painful condition that results from irritation or constriction of the tendons at the base of the thumb. *See generally* American

2

Plaintiff's right wrist. (DSF ¶ 11; PSF ¶ 16.) After a return visit on November 8, Dr. Labana recommended that Plaintiff remain off work for the next three weeks. (DSF ¶ 11; PSF ¶ 17.) The same day, Defendant notified Plaintiff that her claim for short-term disability benefits had been approved effective October 8, 2012. (PSF ¶ 18.)

Though Dr. Labana eventually released Plaintiff in January to return to work with some restrictions on her physical activities, Plaintiff continued to struggle with performance of job-related tasks such as typing, filing, and lifting objects weighing over five pounds. (*Id.* ¶¶ 23–24.) On January 24, 2013, Plaintiff was evaluated by Dr. Anton Fakhouri, a hand and upper extremity orthopedic specialist, who remarked that "she has clear evidence of . . . carpal tunnel syndrome despite unremarkable EMG. This is consistent with a false negative result." (*Id.* ¶ 25.) Plaintiff elected to undergo surgery on both wrists, and Dr. Fakhouri recommended that she remain off work until a future date "to be determined." (*Id.*) On February 11, 2013, Dr. Fakhouri performed carpal and cubital tunnel release surgery along with a medial epicondylectomy[2] on Plaintiff's left arm. (DSF ¶ 12; PSF ¶ 26.) Plaintiff underwent the same surgery on her right arm on May 20, 2013. (DSF ¶ 22; PSF ¶ 31.)

## II.     Plaintiff's Suspected Cervical Spine Problems

Plaintiff reported for follow-up visits with Dr. Fakhouri for the next few months. Although Dr. Fakhouri noticed some continued tenderness, as well as contusions on her hands and a

---

Academy of Orthopaedic Surgeons, *De Quervain's Tendinosis*, Ortho Info, http://orthoinfo.aaos.org/topic.cfm?topic=a00007 (last visited Aug. 31, 2016).

[2]     The carpal tunnel is the passageway that connects the forearm to the palm on the palm side of the wrist. The cubital tunnel is the passageway composed in the elbow through which the ulnar nerve passes. During carpal and cubital tunnel release surgery, surgeons cut and divide the ligaments at the "roofs" of the respective tunnels to increase the tunnels' size and decrease pressure on the nerves. Medial epicondylectomy involves the removal of part of the medial epicondyle (the bony bump at the inside of the elbow) to allow further release of the nerve. *See generally* American Academy of Orthopaedic Surgeons, *Ulnar Nerve Entrapment at the Elbow (Cubital Tunnel Syndrome)*, Ortho Info, http://orthoinfo.aaos.org/topic.cfm?topic=a00069 (last visited Aug. 31, 2016); American Academy of Orthopaedic Surgeons, *Carpal Tunnel Syndrome*, Ortho Info, http://orthoinfo.aaos.org/topic.cfm?topic=a00005 (last visited Aug. 31, 2016).

rash on her forearm and elbow resulting from falls she had suffered, he noted that Plaintiff was "doing well" and that he would consider releasing her to return to work in August 2015. (PSF ¶¶ 32–33, 35.) By the time she saw Dr. Fakhouri on August 22, Plaintiff exhibited full range of motion in her right elbow, and the doctor recommended that she discontinue physical therapy and avoid heavy lifting and other difficult activities for two to three weeks. (DSF ¶ 25; PSF ¶ 36.) By that point, he expected, she would be ready to return to light-duty work. (*Id.*) At her next visit on September 5, however, Plaintiff complained about a new pain extending from her neck to her right arm, as well as swelling of her right elbow. (PSF ¶ 37.) Dr. Fakhouri's examination revealed cervical spine tenderness and a positive Spurling test.[3] (*Id.*) An X-ray that day revealed degenerative joint disease in Plaintiff's cervical spine. (*Id.*) Dr. Fakhouri also posited that the swelling in her right elbow may be caused by tendonitis. (*Id.*) He administered a cortisone injection and also prescribed a corticosteroid for inflammation, an anti-convulsant, and an opioid analgesic for pain. (*Id.*)

One week later, Plaintiff underwent a neck MRI exam that revealed cervical spinal stenosis,[4] most marked at the C6-7 level of her spine. She also exhibited moderate neural foraminal stenosis[5] at several levels. (DSF ¶ 26; PSF ¶ 38.) Dr. Fakhouri met with Plaintiff again on September 19. (PSF ¶ 39.) She reported minimal improvement in her symptoms and added that she had experienced significant pain from trying to type at home. (*Id.*) Dr. Fakhouri

---

[3] A Spurling test is a method for evaluating cervical nerve root impingement. During the test, the patient extends her neck and rotates, bending her head toward the symptomatic side while examiner presses down on the top of her head. The test is considered positive when the maneuver elicits arm pain down the arm of the symptomatic side. *See Spurling Test,* mediLexicon, http://www.medilexicon.com/medicaldictionary.php?t=90833 (last visited Aug. 31, 2016).

[4] Cervical spinal stenosis is the narrowing of the open spaces within the cervical spine, which can put pressure on the spinal cord and nerves that travel through the spine to the extremities. (PSF ¶ 38 n.13.)

[5] Neural foramina are the openings in the spinal canal which transmit nerves to the rest of the body. Spinal stenosis can be caused by narrowed spinal canal or narrowed neural foramina. (*Id.* n.14.)

referred her for epidural steroid injections and advised her to follow up with a spine surgeon if her symptoms persisted for another four weeks. (*Id.*) In the meantime, he recommended that she remain off work. (*Id.*)

### III.     Defendant's Denial of Plaintiff's Long-Term Disability Benefits

Defendant approved Plaintiff's initial claim for short-term disability benefits through April 15, 2013, which would be approximately two months after Plaintiff's first surgery. (DFS ¶ 13.) On March 22, while recovering from her first surgery but before her second surgery, Plaintiff completed an application for long-term disability benefits. That claim was approved on April 8, effective April 14, 2013. (DFS ¶¶ 14, 16.) In administering benefit plans, Defendant employs nurses to act as "medical consultants" and conduct reviews of beneficiaries' claims. One of those nurses, Nurse Laura Doble, conducted a review of Plaintiff's claim on July 15, 2013 and noted that Plaintiff had had surgery on her left arm that February and on her right arm that May. (DSF ¶ 23.) Doble observed that the usual recovery time for Plaintiff's surgery was six weeks according to the Medical Disability Advisor, and that that guideline would support restrictions and limitations on Plaintiff's work through July 1, 2013. (*Id.*) Another of those nurses, Nurse Jeanette Stehly, had also noted that six weeks is the usual post-surgery recover period for the type of surgery Plaintiff had and the type of work to which she would be returning. (DSF ¶ 16; PSF ¶ 34.)

On several occasions in August and September, Defendant requested additional medical information from Plaintiff, including an updated attending physician statement ("APS") and a capabilities and limitations worksheet ("CLW"). (DSF ¶ 24.) Having receveid no response from Plaintiff, on October 3 Defendant sent a follow-up letter requesting the additional information. Plaintiff did provide some additional medical information on October 3 but did not include an updated APS or CLW. Earlier, on September 17, Nurse Doble had reviewed Plaintiff's medical records and determined that she did not have any restrictions or limitations past the date of July 1, 2013 that would preclude her from using her upper extremities to

5

perform her work activities and lift up to ten pounds. (DSF ¶ 27.) Plaintiff notes that at the time Nurse Doble conducted this review, she did not have access to Plaintiff's September 12 MRI results or to Dr. Fakhouri's most recent treatment notes. (Pl.'s Resp. to DSF ¶ 27.) Plaintiff also points out that Nurse Doble's determination that Plaintiff had no limitations on her activity is contradicted by her physical therapy records from July and August 2013, which show reduced range of motion, swelling, diminished sensation to light touch, and pain. (*Id.*)

Nurse Doble performed another medical review on October 8, noting that Dr. Fakhouri had not imposed any restrictions or limitations on Plaintiff's ability to work even though he had opined that she could not yet return to work; that Plaintiff was well past the usual post-surgery recovery time; and that there was no objective medical evidence of any impairment precluding Plaintiff from returning to work at any level. (DSF ¶ 32; PSF ¶ 40.) The next day, Dr. Fakhouri completed an APS and CLW in which he stated that Plaintiff could not work due to chronic bilateral carpal tunnel syndrome, bilateral cubital tunnel syndrome, and medial epicondylitis of the elbows. (PSF ¶ 41.) He also noted that a portion of the CLW had been completed by Plaintiff before he received the form. (*Id.*; DSF ¶ 34.)

That same day, October 17, 2013, Defendant notified Plaintiff by letter that her long-term disability benefits had been terminated effective October 9. (DSF ¶ 33; PSF ¶ 42.) In its denial letter, Defendant stated that Plaintiff had "remained out of work after surgery on both wrists and elbows well beyond the Medical Disability Advisor Guidelines," and that "although your physician indicates you cannot return to work, he has provided no restrictions and limitations." (*Id.*) That same day, Nurse Stehly performed another medical review, concurring with Nurse Doble's prior opinion because no exam findings were provided regarding range of motion, strength testing, gait observation, grip strength testing, or new diagnostic information. (DSF ¶ 35.) She also questioned the validity of the information contained in the CLW because it had been provided by Plaintiff herself, not her doctor. (*Id.*)

On October 22, Defendant received consultation notes from Dr. Yaw N. Donkoh, who

6

had observed Plaintiff on October 11. (DSF ¶ 36.) Dr. Donkoh observed that Plaintiff "had good range of motion of the C-spine in rotation and flexion and extension. Grip strength was 5/5 in both upper extremities. Sensation was intact. Hoffman's[6] was negative bilaterally." (*Id.*) He prescribed additional medication to address Plaintiff's pain and to improve her insomnia, and he scheduled her for a cervical epidural spine injection and encouraged her to obtain an updated EMG. (PSF ¶ 43.) Defendant also received notes from Plaintiff's October 17 visit to Dr. Fakhouri's office, at which he noted that Plaintiff continued to exhibit a positive Spurling test and other symptoms "consistent with cervical radiculopathy."[7] (PSF ¶ 43–44; Pl.'s Claim File [36] at 798. Based on this updated information, Nurse Doble completed another medical review on October 28, 2013, finding no medical evidence to suggest that Plaintiff had decreased strength or sensation in her upper extremities and noting that Plaintiff's range of motion in her cervical spine was good on exam. (DSF ¶ 37; PSF ¶ 45.)

Defendant again requested updated medical opinions regarding Plaintiff's functionality. (DSF ¶ 38; PSF ¶ 46.) On November 13, 2013, Dr. Fakhouri responded, stating that Plaintiff was not capable of working until her symptoms subsided and she regained further function of the upper extremity, which he estimated would take at least four to six weeks. (DSF ¶ 38.) Dr. Donkoh declined to provide a functional assessment and instead recommended that Plaintiff undergo a "functional capacity exam with validation." (DSF ¶ 39; PSF ¶ 46.) Based on this information, Nurse Doble conducted another review of Plaintiff's medical records and determined that there was no objective medical evidence to support Plaintiff's claimed inability

---

[6] The Hoffmann reflex test involves flicking the patient's middle fingernail to elicit flexion of the thumb and the tips of the index finger or ring finger. The test is positive if the flexion occurs, which indicates compression of the spinal cord. *See generally Hoffman Sign: Red Flag for Cervical Myelopathy*, Orthopod, http://eorthopod.com/news/hoffmann-sign-red-flag-for-cervical-myelopathy/ (last visited Aug. 31, 2016).

[7] Cervical radiculopathy involves nerve pain radiating from the neck down to the shoulder, arm, forearm, and into the hand, and is associated numbness or weakness. *See generally* Mark J. Spoonamore, *Radiculopathy (Arm Pain)*, http://www.uscspine.com/conditions/radiculopathy.cfm (last visited Aug. 31, 2016).

to return to work. (DSF ¶ 40.) On November 21, Defendant affirmed its decision to terminate her long-term disability benefits and notified her of her right to file a written appeal. (DSF ¶ 41; PSF ¶ 47.)

Plaintiff appealed Defendant's decision on December 17. (DSF ¶ 42; PSF ¶ 48.) She submitted a statement from Dr. Fakhouri dated December 17, 2013 excusing her from work until January 6, 2014 as "unable to work until symptoms subside and she regains further motion of [her] right upper extremity." (DSF ¶ 43; PSF ¶ 49.) Dr. Fakhouri added that Plaintiff was scheduled to undergo another epidural spine injection on December 20 and would be seen by him in follow-up on December 31. (PSF ¶ 49.) Nurse Michael Grace performed another medical review on December 24, 2013, as part of Plaintiff's administrative appeal review. (DSF ¶ 44.) He pointed out that Dr. Fakhouri's note did not contain any quantified physical exam results confirming that Plaintiff had limited strength or range of motion; Nurse Grace concluded that the note was not sufficient to establish a functional impairment. (*Id.*) On January 3, 2014, Plaintiff sent Defendant a copy of the treatment note from her December 31 visit with Dr. Fakhouri, which stated that she had pain in the medial aspect of her right elbow with positive Tinel's sign,[8] a positive Spurling test, and tenderness in her lower cervical spine. (PSF ¶ 50.) Dr. Fakhouri once again noted that he believed Plaintiff was suffering from cervical radiculopathy and recommended that she see a pain specialist and neurosurgeon; he also recommended another EMG study of her upper extremities and extended her off-work status until further notice. (*Id.*) On January 8, Plaintiff underwent another EMG, the results of which were again normal; she submitted this to Defendant, along with the January 14, 2014 treatment note of Dr. Fakhouri, who reaffirmed her history of cervical radiculopathy, notwithstanding her normal EMG results, and again recommended that she follow up with her pain specialist and

---

[8] Tinel's sign is positive when lightly banging over a particular nerve elicits a sensation of tingling in the distribution of the nerve. A positive sign indicates that the nerve is irritated. *See generally Definition of Tinel's sign*, MedicineNet, http://www.medicinenet.com/script/main/art.asp?articlekey=16687 (last visited Aug. 31, 2016.)

neurosurgeon. (DSF ¶ 45; PSF ¶ 51.)

On January 29, 2014, Plaintiff saw Dr. Leslie Schaffer, a neurosurgeon, who confirmed that Plaintiff suffered from cervical radiculitis[9] and cervical disc disease supported by MRI evidence, pain upon rotation and extension of her neck, and decreased grasp in her right hand. (PSF ¶ 52.) Dr. Schaffer recommended physical therapy with no neck manipulation and re-evaluation in four weeks; he also recommended that Plaintiff remain off work until that time. (*Id.*) Plaintiff sent this treatment note to Defendant, along with an initial physical therapy note dated February 10, 2014, which documented markedly reduced range of motion of Plaintiff's cervical spine. (PSF ¶ 53.) Her cervical flexion, extension, and bilateral lateral flexion measurements ranged from 10 to 20 degrees, and her left and right rotation measured 21 degrees and 31 degrees, respectively. (*Id.*) One of the stated goals of her physical therapy was to increase those ranges of motion to be within normal limits under the American Academy of Orthopaedic Surgeons (AAOS) standards. (Pl.'s Claim File at 741.) Plaintiff represents that 60 degrees is normal under those the AAOS; Defendant does not dispute this, but insists that such evidence is beyond the administrative record. (Def.'s Resp. to PSF ¶ 53.) Plaintiff's physical therapy note also stated that she exhibited diminished right grip strength of 40 pounds, compared to 60 pounds on the left. (*Id.*) And on the Owestry Neck Index,[10] Plaintiff received a score of 66 percent. (*Id.*) Plaintiff maintains that such a score signifies "severe disability" according to the Neck Disability Index. (*Id.*) Defendant insists that such evidence, too, is outside the scope of the administrative record. (Def.'s Resp. to PSF ¶ 53.)

On February 20, 2014, Defendant requested that MES Solutions, Inc. ("MES"), a company that provides peer review reports for insurance companies, obtain a review of

---

[9] The term "radiculitis" usually indicates pain, without the associated numbness or weakness, shooting down the arm into the hand and fingers.

[10] The Owestry Neck Index is patient-completed, condition-specific questionnaire used to determine a patient's functional status as a result of his or her neck pain. The patient's questionnaire is scored against a standardized scale. *See generally Neck Disability Index*, Physiopedia, http://www.physio-pedia.com/Neck_Disability_Index (last visited Aug. 31, 2016.)

Plaintiff's medical records and clarify whether it was "reasonable that the [employee] would be unable to perform her occupation for the period noted until at least the end of [physical therapy] if surgical intervention is warranted?" (PSF ¶ 54.) One week later, while Defendant was waiting for MES's report, Plaintiff furnished Defendant with the treatment note from her February 26, 2014 office visit with Dr. Schaffer, which said, "Off work till re-evaluated on 3-12-14. Pt. seeking second opinion for surgery that is needed," along with a fax coversheet from Plaintiff, who wrote, "I have to have surgery on my neck. I am getting a second opinion before surgery." (PSF ¶ 55.) Melissa Cooper, the appeals specialist assigned to Plaintiff's claim, failed to forward those documents to Defendant's reviewing physician for inclusion in his review, mistakenly believing that they were duplicative of previously submitted medical evidence. (*Id.*)

Dr. Naresh D. Sharma, a pain management specialist working for MES, completed an independent physical review, as requested by Defendant, on March 3, 2014. (DSF ¶ 47; PSF ¶ 56.) Dr. Sharma had attempted peer-to-peer consultants with Drs. Fakhouri and Schaffer, but had not reached them successfully. (DSF ¶ 48; PSF ¶ 59.) Dr. Sharma opined that Plaintiff was not functionally impaired or restricted during the period of October 9, 2013 to February 20, 2014, and that she was capable of performing work at any level of physical demand "from sedentary to very heavy level for the above time period." (DSF ¶ 49; PSF ¶ 56.) He noted that her medical records did not show any evidence of neurological deficit such as reflex, deep tendon deficits, or motor weakness, and that her electro-diagnostic studies were within normal limits. (DSF ¶ 49; PSF ¶ 57.) He also opined that Plaintiff's MRI findings dated September 12, 2013 were not consistent with her right upper extremity and neck symptoms; that Plaintiff's provider's assessment of restrictions and limitations was based purely on Plaintiff's self-reported symptoms and not objective medical evidence; and that Plaintiff had undergone appropriate surgical interventions for carpal and cubital tunnel release. (DSF ¶ 49; PSF ¶ 58.) Dr. Sharma concluded that Plaintiff was capable of performing a sedentary physical demand–level job. (DSF ¶¶ 50–52.)

Defendant provided copies of Dr. Sharma's reports to Drs. Fakhouri and Schaffer on March 5, 2014. (DSF ¶ 53; PSF ¶ 60.) Dr. Fakhouri did not respond, and Dr. Schaffer responded only with a handwritten note stating, "We are not the doctor who did all her hand and elbow surgeries. We just saw her 2 times 1/29/14 & 2/26/14. We did not keep her off work since 2012 contact the proper MD." (DSF ¶ 54; PSF ¶ 60.) On March 14, Defendant notified Plaintiff by letter that it had affirmed its decision to terminate her long-term disability benefits effective October 9, 2013. (DSF ¶ 55; PSF ¶ 61.) On May 8, Plaintiff underwent an anterior cervical discectomy and fusion surgery at the C6-7 level with Dr. Sergey Neckrysh, a neurosurgeon. (PSF ¶ 62.) She filed this suit on June 23, 2014. (DSF ¶ 56; PSF ¶ 63.) Defendant maintains that its decision to deny Plaintiff's claim for disability benefits was supported by the lack of evidence in her record that she was too disabled to perform the duties of her own occupation. Defendant thus urges the court to defer to Defendant's reasonable exercise of its discretion in administering the plan. Plaintiff responds that the evidence in her medical record clearly demonstrates that she was disabled and that Defendant's failure to consider such evidence was unreasonable and warrants reversal of Defendant's decision. As mentioned above, both parties have moved for summary judgment.

## **LEGAL ANALYSIS**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When, as here, an ERISA plan explicitly gives the plan administrator discretion to interpret the terms of the plan, our review of a denial of benefits asks only whether the plan administrator's decision was arbitrary and capricious. *Rabinak v. United Bhd. of Carpenters Pension Fund*, ___ F.3d ___, 2016 WL 4248377, at *2 (7th Cir. Aug. 10, 2016). "Review under this deferential standard is not a rubber stamp, however . . . ." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010). A court will "not uphold a termination when there is an absence of reasoning in the record to support it." *Hackett v. Xerox Corp. Long-Term Disability*

*Income Plan*, 315 F.3d 771, 774–75 (7th Cir. 2003). That said, "[t]he arbitrary and capricious standard is the least demanding form of judicial review of administrative action, and any questions of judgment are left to the administrator of the plan." *Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996) (citing *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)).

Plaintiff argues that Defendant acted unreasonably by failing to adequately consider her cervical radiculopathy diagnosis in denying her benefits. She asserts that instead of considering Plaintiff's entire medical history, Defendant improperly relied on the Medical Disability Advisor Guidelines to determine that Plaintiff had remained out of work for too long. Such undue reliance, she argues, constitutes arbitrary and capricious decision-making under *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914 (7th Cir. 2003). In *Hawkins*, the Seventh Circuit determined that an ERISA plan administrator's denial of disability benefits was unreasonable. 326 F.3d at 919. In denying the benefits claim, the administrator had relied on the opinion of its medical consultant, but "the gravest problem" with that consultant's analysis was his emphasis "on the difference between subjective and objective evidence of pain." *Id.* at 919. The analysis was problematic because the severity of the claimant's fibromyalgia, in particular the amount of pain and fatigue he felt, could not readily be established through objective evidence. *Id.* Although the court conceded that the arbitrary-and-capricious standard of review made the case a close one, the court concluded that "[t]he record contain[ed] nothing more than scraps to offset the evidence presented by" the plaintiff and his own treating doctor. *Id.*

Plaintiff also points to Cooper's failure to share with Dr. Sharma the notes from Dr. Schaffer and Plaintiff, notes indicating that Plaintiff needed additional surgery. According to Plaintiff, Cooper's failure to share such information, and Dr. Sharma's failure to consider it, demonstrates that Defendant's decision process was arbitrary and capricious. In *Weske v. Hartford Life and Accident Ins. Co.*, No. 13-3554(DSD/JJK), 2015 WL 627932 (D. Minn. Feb. 12,

2015), another district court ruled that a plan administrator's decision to terminate disability benefits during the plaintiff's pre-surgery period was not supported by substantial evidence, where the record included uncontradicted evidence that the plaintiff could not stand, walk, or return to work during that period. *Id.* at *5. The court was troubled by the timing of he decision to terminate benefits; that termination, occurring just before surgery, "evince[d] a desire to avoid coverage for the post-surgery period." *Id.* at *6. Similarly, the district court in *Vartanian v. Metro. Life Ins. Co.*, No. 01 C 2674, 2002 WL 484852 (N.D. Ill. Mar. 29, 2002), could "determine no reasonable or rational basis," apart from "a predisposition or inclination to terminate benefits" why an insurer would not at least defer taking action until after the plaintiff's anticipated surgery and rehabilitation had been completed. *Id.* at *10. Plaintiff contends that Defendant's failure to acknowledge her cervical radiculopathy diagnosis and quick termination of benefits prior to her surgery suggests a similar "hurried determination to terminate benefits based upon the thinnest evidence" as a way to avoid liability for her post-surgery period. *Id.*

Defendant counters these arguments primarily with Dr. Sharma's analysis. Dr. Sharma maintains that he took into account the views of Plaintiff's treating physicians, but ultimately concluded that she was no longer disabled because the opinions of her physicians were not supported by objective medical evidence showing functional restrictions or impairments. In addition, Defendant points to the notes from Dr. Donkoh, who performed a physical examination of Plaintiff and found "good range of motion of the C-spine," good grip strength, intact sensation, and absence of Hoffman's reflex on October 11, 2013. (DFS ¶ 36.) And, though Plaintiff points to medical literature noting that false-negative EMG results are relatively common, the fact remains that her EMG results were normal in both October 2012 and January 2014. (Pl.'s Mem. in Supp. of Summ. J. [62] at 10 n.2.)

It may be reasonable in some cases for an administrator to deny benefits based on a lack of objective evidence indicating the degree to which the claimant's pain affects her functional capacities. *See Speciale v. Blue Cross and Blue Shield Ass'n*, 538 F.3d 615, 624

(7th Cir. 2008); *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 323 (7th Cir. 2007) ("Because Williams's functional limitations due to his fatigue could be objectively measured, the Plan did not act arbitrarily and capriciously in denying Williams's initial application or appeal on the basis that the record lacked accurate documentation in this regard."). There is also no requirement under ERISA that plan administrators "accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). Nor are administrators subject to a "heightened burden of explanation" when they reject the opinion of a treating physician. *Id.*

This case, however, is different in important respects from the cases Defendant cites in which the Seventh Circuit has upheld a denial of benefits based on a lack of objective evidence, namely *Speciale* and *Williams*. In *Speciale*, for example, the claimant's own treating physicians believed that she could work with some restrictions, thereby seriously undermining her claim of total disability. *See* 538 F.3d at 621–22. And in *Williams*, the plan administrator had offered reasons to believe that the assessment of claimant's treating physician was unreliable. For example, the physician had marked sections of a questionnaire gauging the patient's functional impairment as "unknown" and "untested," leading the administrator and the court to question the accuracy of the physician's assessment. *See* 509 F.3d at 323. In this case, in contrast, Plaintiff's treating physicians believed that her symptoms precluded her from working, and Defendant has asserted no plausible ground for suspecting that their conclusions were the product of faulty assessment methods.

Rather, this case more closely resembles *Holmstrom*, in which the Seventh Circuit ruled that it was arbitrary and capricious for an administrator to rely on the opinions of record-review doctors when every doctor who had examined the plaintiff had concluded, contrary to the findings of those record-review doctors, that she was disabled. *Holmstrom*, 615 F.3d at 775. Drs. Fakhouri and Schaffer concluded repeatedly and consistently over the course of regular checkups that Plaintiff was not fit to work. Dr. Donkoh expressed no opinion on the subject. Dr.

14

Sharma, to his credit, considered the opinions of Plaintiff's treating physicians; indeed, he tried unsuccessfully to reach Drs. Fakhouri and Schaffer, and Defendant later sought responses from the same doctors after Dr. Sharma published his report. But Dr. Sharma also included in his report language that was, troublingly, at odds with the evidence presented to him. It was his opinion that Plaintiff was capable of even "very heavy level" physically demanding work from October 9, 2013 forward, a conclusion contradicted by the diagnoses and recommendations of Drs. Fakhouri and Schaffer and seemingly without any clear factual support. (DSF ¶ 49; PSF ¶ 56.) Dr. Sharma considered Plaintiff's MRI results to be explainable as consistent with the normal aging process and speculated that they had been so caused, rather than crediting either Dr. Schaffer's assessment that the MRI results were consistent with his cervical radiculopathy diagnosis or Plaintiff's self-reported pain symptoms. In addition, it is not clear why the fact that age was the *cause* of her condition would undermine her claim that the condition rendered her disabled.

The opinions of Plaintiff's treating physicians were certainly based in part on her reported pain, as Dr. Sharma articulated, but they also had support in objective medical evidence such as Plaintiff's diminished grip strength in her right hand; Owestry Neck Index, MRI, and Spurling test results; and conspicuously decreased cervical and bilateral lateral flexion. Thus, even with the deference owed to Defendant in making this determination, the evidence in the record suggests that Defendant acted unreasonably by rejecting the opinions of two of Plaintiff's treating physicians in favor of Dr. Sharma's opinion. That opinion appears to have unduly emphasized the lack of objective evidence of Plaintiff's disability, ignored strong evidence of her subjective pain, and reached a conclusion about her ability to perform highly demanding work without identified factual support. The court also notes that the financial relationship between Aetna and Dr. Sharma, through MES, does suggest the possibility of a conflict of interest. Plaintiff points out that Dr. Sharma's payments for reviewing Defendant's claims nearly doubled during the relevant time—from $7,846.75 in 2013 to $13,900.75 in 2014—and that the amount

Defendant paid MES also increased during that time. This fact, standing alone, would not render Defendant's or Dr. Sharma's opinion unreasonable, but does suggest a possible (unsatisfying) explanation for why Defendant would rely on Dr. Sharma's report despite some of its flaws discussed above. Indeed, it is well-settled that "courts should be aware of structural conflicts of interest in reviewing plan decisions for abuse of discretion." *Raybourne v. Cigna Life Ins. Co. of New York*, 576 F.3d 444, 449 (7th Cir. 2009) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 109 (2008)). Although a it is just one factor among many to be weighed in the abuse-of-discretion analysis, "structural conflict may not be ignored." *Id.*

In addition, while it appears that Dr. Sharma did not know that Plaintiff was awaiting yet another surgery when he was preparing his report, Defendant did have notice of this fact. Defendant's failure to consider at least postponing the termination of benefits for further inquiry into that surgery is troubling. Ultimately, the reports of Plaintiff's treating physicians, which were supported by objective measures, overwhelmingly favored a finding that Plaintiff was severely impaired. The strongest contrary proof, her EMG results and Dr. Donkoh's report of positive scores on some objective measures, is undercut by a convincing assortment of other medical test results showing that Plaintiff had cervical radiculopathy, and by the possibility that the EMG results were false negatives. The EMG results, and the reports from Dr. Donkoh and Dr. Sharmaose results, and Dr. Sharma's report, are "scraps" that slightly offset Plaintiff's evidence, but do not suffice to cast as reasonable Defendant's decision to terminate Plaintiff's benefits. Plaintiff is therefore entitled to summary judgment.

Plaintiff asks that the court order reinstatement of her benefits rather than "remanding" the case to the plan administrator for reconsideration. The Seventh Circuit has held, however, that this is only an appropriate remedy where the case for reinstatement of benefits is airtight or virtually unimpeachable. *See Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 398 (7th Cir. 2009) (explaining that when administrator has not adequately justified its decision to deny benefits, remand is generally the proper remedy, and citing *Gallo v. Amoco Corp.*, 102

F.3d 918, 923 (7th Cir. 1996), and *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 477 (7th Cir. 1998)). This court therefore remands Plaintiff's claim to Defendant for reconsideration. If Defendant still concludes, after a thorough good-faith review of the medical evidence in Plaintiff's case, that she is not entitled to long-term disability benefits, then "it must adequately explain the reasons supporting its decision, including at a minimum an explanation of why it is discounting the medical opinions of [Plaintiff's] treating physicians," *Love*, 574 F.3d at 398, particularly because in this case some of those opinions were firmly rooted in objective medical evidence. Defendant should also explain its reliance on a report which contains factually unsupported assertions, such as Dr. Sharma's statement that Plaintiff is capable of performing even very physically demanding work.

## **CONCLUSION**

For the foregoing reasons, the court grants Plaintiff's motion for summary judgment [52] and denies Defendant's motion [48] for summary judgment. Plaintiff's claim is remanded for further consideration.

ENTER:

Dated: September 6, 2016

_____
REBECCA R. PALLMEYER
United States District Judge